**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Criminal No. 1:11-CR-11** |
| | ) | **Hon. Anthony J. Trenga** |
| SEAN THEODORE BREHM | ) | **Hearing Date: March 18, 2011** |
| | ) | |
| Defendant, | ) | |

**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**
**AS BEYOND CONGRESS'S ENUMERATED POWERS**

Defendant Sean Theodore Brehm, by counsel, and pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure, hereby moves this Honorable Court to dismiss this case because Congress lacks the power to criminalize the conduct at issue.

**INTRODUCTION**

Congress does not have power to criminalize garden-variety assaults between non-United States citizens that occur outside the United States and do not harm the operations of the United States military or its contractors. The United States Constitution protects individual liberty by limiting the federal government to its enumerated powers. The Constitution does not provide Congress with a general police power and limits its powers to those listed in Article I, § 8. *See also United States v. Lopez*, 514 U.S. 549, 552 (1995) (citing Art. I., § 8 for the proposition that "[t]he Constitution creates a Federal Government of enumerated powers").

As applied to the undisputed facts of this case, MEJA exceeds Congress's enumerated powers. MEJA's legislative history cites several clauses within Article I, § 8 that Congress believed provided it with authority to enact the statute. While the powers enumerated in those clauses would support the constitutionality of MEJA in other circumstances, neither those

clauses nor any other Constitutional provision permits Congress to criminalize a relatively minor assault involving two non-United States citizens that did not harm the operation of the United States military.  Accordingly, the Court should dismiss this case because MEJA may extend only as far as Congress's authority to legislate.

**FACTUAL BACKGROUND**

The undisputed facts regarding this case are set forth in Mr. Brehm's previously-filed Motion To Dismiss For Lack Of Jurisdiction and are incorporated here by reference.  *See* Defendant's Motion To Dismiss for Lack of Jurisdiction at 2-3 (Docket No. 23).  In addition to the facts set forth therein, the following facts relevant to this motion are as follows:

Mr. Brehm, a South African citizen, is accused of assaulting J.O., a British citizen on November 25, 2010.  The assault allegedly occurred at the Kandahar Airfield in the Islamic Republic of Afghanistan ("Afghanistan"), which is controlled and operated by the North Atlantic Treaty Organization ("NATO").

Significantly, Mr. Brehm and J.O.'s presence at the Kandahar Airfield on November 25, 2010, had no connection to the operations of the United States military in Afghanistan.  J.O. was at the Airfield because he had just arrived on a flight operated by a private company.  Mr. Brehm was at the Airfield to greet passengers arriving on a different private charter flight.  J.O. approached Mr. Brehm and a heated argument ensued.  That argument related to a pre-existing personal dispute and soon digressed into a physical altercation between the two men.  The entire incident lasted a matter of minutes.

It is undisputed that, during the physical altercation, both men were acting outside the scope of their employment.  Mr. Brehm and J.O. were not employees of the United States

military or any other component of the United States government.  Rather, both men were employed for private entities in Afghanistan.  Mr. Brehm was employed by DynCorp, a Department of Defense ("DOD") contractor.  His job duties for DynCorp involved travel-related clerical work and did not include participating in military activities nor did they require him to engage in combat.  The incident did not hinder DynCorp's operations in Afghanistan or impact the company's support of the United States military.

In total, the incident was nothing more than a fight between two foreign nationals that did not harm the operations of the United States military or its corporate contractors.  But for the fact that Mr. Brehm worked for a DOD contractor, the incident is indistinguishable from a fight occurring between any two foreign men in any foreign country.  As detailed below, the mere fact that Mr. Brehm was employed by a DOD contractor does not make his conduct subject to Congress's authority to impose criminal sanction.

<u>**ARGUMENT**</u>

**I.      CONGRESS DOES NOT HAVE POWER TO CRIMINALIZE THE CONDUCT AT ISSUE IN THIS CASE.**

This case should be dismissed because, as applied to the undisputed facts, MEJA extends beyond Congress's Constitutional authority.  Congress has no power to act unless the Constitution authorizes it to do so.  *See McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819) ("This government is acknowledged by all to be one of enumerated powers"); *United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."). Congress's power to legislate is limited to the powers set forth in Article I, § 8.  The powers listed in Article I, § 8 do not include any

3

general police power.  Accordingly, for a federal criminal statute to be valid, the exercise of police power must be authorized by and in furtherance of one of the enumerated powers listed in Article I, § 8.

This case thus presents a narrow question concerning the scope of Congress's powers under Article I, § 8.  Significantly, Mr. Brehm is *not* challenging MEJA on its face.  Mr. Brehm is *not* claiming that Congress lacks the power to criminalize the conduct of foreign DOD contractors in all cases.  Indeed, if a foreign employee of a DOD contractor assaulted a member of the United States armed forces or defrauded the United States government, there is little doubt that Congress could punish him pursuant to MEJA.  Mr. Brehm's challenge does not require the Court to address these issues.  Rather, his challenge to Congress's authority is limited to the undisputed facts of his case.[1]

Thus, the issue before the Court is whether the powers set forth in Article I, § 8 permit Congress to criminalize a one-time assault by one foreign national against another foreign national that does not harm any United States citizen, the United States military, or its private

---

[1] Because Mr. Brehm is challenging MEJA *as applied* in his case, his argument is very different from the one presented by the defendant in *United States v. Williams*, 722 F. Supp. 2d 1313 (M.D.Ga. 2010).  In *Williams*, the defendant, an American citizen, was charged under MEJA for abusing his stepdaughter in Japan while his wife, a member of the U.S. Air Force, was stationed there.  *Id.* at 1315.  The defendant brought a facial challenge to MEJA, arguing that there were no circumstances under which MEJA could be constitutional.  *Id.* at 1316-17.  After noting that such a facial challenge was "the most difficult to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid," the District Court quickly dismissed the challenge on the grounds that "Congress unquestionably has the authority to enforce its laws beyond the territorial boundaries of the United States."  *Id.* at 1317 (internal quotations omitted).  This reasoning, which is not binding on this Court in any event, is wholly inapplicable here because Mr. Brehm has presented an as-applied challenge to MEJA.  He does not dispute that there exist many circumstances under which MEJA could constitutionally be applied.

sector contractors.  This Court must answer that question in the negative, as the framers did not grant Congress the power to police routine assaults between foreigners that occur abroad and do not harm the United States.

### A.   The Constitutional Provisions Cited In MEJA's Legislative History Do Not Provide Congress With Authority To Regulate The Alleged Offense Conduct.

The plain terms of MEJA apply to any foreign DOD contractor (regardless of connection to the United States) who "engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than one year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States."  18 U.S.C. § 3261(a)(1).  Although this language is seemingly limitless on its face, it is necessarily limited by Congress's power to act.

In its final Report encouraging Congress to pass MEJA, the House Judiciary Committee made a "find[ing]" that it had authority to enact the statute under "Article I, section 8, clauses 10, 14, 16, and 18 of the Constitution."  H.R. REPT. NO. 106-778(I) (2000), 2000 WL 1008725, at *14.  At the same time Congress made this finding, it was aware its authority to regulate conduct under MEJA was subject to Constitutional constraints.  Specifically, in a letter supporting MEJA's passage, DOD Acting General Counsel Douglas A. Dworkin provided the following warning regarding MEJA's constitutional limits – and promised that the DOD would work to develop a "mechanism" to avoid constitutional overreaching:

> In this regard, it is noted that the broad definition of a person accompanying the Armed Forces outside the United States contained in section 3264(2) of the bill conceivably could be applied to foreign nationals whose nexus with the United States is so tenuous as to raise certain Constitutional concerns. The Department will work to develop a mechanism that will obviate the possibility of such applications. Preferably, such a measure would take the form of a provision in the

> statutorily–mandated implementing regulations that would preclude the apprehension, detention and prosecution of certain foreign nationals, employed by or accompanying a defense contractor, whose relationship with the United States is of such a tenuous nature.

H.R. REPT. NO. 106-778(I) (2000), 2000 WL 1008725, at *21.

The DOD, however, has not enacted a regulation or any other mechanism that places substantive constraints on the government's ability to prosecute contractors with a "tenuous" connection to the United States.[2]  Although the government has not enacted a regulation or other mechanism to limit the scope of MEJA prosecutions, its authority is necessarily limited by the Constitution.  Those limits include the requirement that Congress not act unless empowered to do so by one of the enumerated powers set forth in Article I, § 8.[3]  None of the § 8 powers listed in MEJA's legislative history provide Congress with the power to regulate the conduct at issue in this case.

Congress does not have the power to criminalize this conduct under Clause 10 of Article I, § 8.  Clause 10 permits Congress "to define and punish Piracies and Felonies committed on the high seas, and offences against the law of nations."  The relatively common assault at issue here is not a piracy, was not committed on the high seas, and lacks the universal condemnation or international recognition necessary as an "offence against the law of nations."  *See Sosa v.*

---

[2] The DOD's MEJA regulation merely encourages consultation with the Department of Justice and the State Department.  *See* 32 C.F.R. § 153.5(a)(8) ("Persons Having a Tenuous Nexus to the United States").  It fails to provide specific, binding standards that would "obviate the possibility"of a MEJA prosecution of a foreign contractor whose connection to the United States is so tenuous as to raise "Constitutional concerns."

[3] As detailed in Mr. Brehm's separately-filed Motion to Dismiss For Lack of Jurisdiction, Docket No. 23, the Due Process Clause is also a Constitutional limit on MEJA prosecutions of foreign DOD contractors.

*Alvarez-Machain*, 524 U.S. 692, 738 (2004) (holding that "the law of nations" is limited to a few universally recognized offenses and rejecting claim that kidnaping violated the law of nations).

Congress's power "to make rules for the government and regulation of the land and naval forces," U.S. Constitution, Art. I., § 8, cl. 14, also does not encompass the conduct at issue here. This clause has been interpreted as permitting Congress to implement "procedures and remedies related to military discipline" for members of the military. *Chappell v. Wallace*, 462 U.S. 296, 301 (1983). Significantly, the Supreme Court has held that Congress's Clause 14 power to implement "procedures and remedies related to military discipline" does not extend to civilians, even when the alleged offense conduct involved members of the military. *See, e.g.*, *Toth v. Quarles*, 350 U.S. 11, 14 (1955) (holding civilian ex-servicemen was not subject to court-martial because "the constitutional grant of power to Congress to regulate the armed forces . . . does not empower Congress to deprive people of trials under Bill of Rights safeguards"). Moreover, Clause 14 has never been construed as permitting Congress to impose criminal sanction on an assault between two foreign nationals that did not harm the operations of the United States military.

Clause 16 is equally inapplicable. It gives Congress the power "to provide for organizing, arming, and disciplining, the Militia, and for governing such part of them as may be employed in the Service of the United States." The meaning of this provision must be interpreted consistent with the concept of a "militia" that existed at the time the Constitution was adopted. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (interpreting terms in the Second Amendment according to their meaning during the founding era). The founding-era concept of a "militia" did not include private sector contractors who perform clerical work at a desk.

Moreover, Clause 16 gave Congress power to organize and arm militias so that they can serve *as part of* the United States military – *i.e.*, it provided Congress with power to organize the then-existing militias so that they "may be employed *in* the Service of the United States."  As the Supreme Court explained in *Heller*, under Clause 16 "Congress retains plenary authority to organize the militia, which must include the authority to say *who will belong to* the organized force."  554 U.S. at 600 (citing Clause 16) (emphasis added).  Mr. Brehm, of course, was not a member of the United States military.  He was a clerical worker for a private company.  Moreover, whatever authority Congress might have under Clause 16 to organize, arm, and discipline DOD contractors as "part of" the "militia," this authority does not extend to activities of DOD contractors outside the scope of their employment that does not harm operations of the United States military.

Nor does Clause 18, the necessary and proper clause, provide Congress with a blank check to criminalize conduct having, at most, only an attenuated connection to the United States.  For a Congressional act to be valid under the necessary and proper clause, it must be necessary to carry out one of the enumerated powers in § 8.  *See Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 247 (1960) (describing Clause 18 as "a caveat that Congress possesses all the means necessary to carry out the specifically granted 'foregoing' powers of § 8").  It is not "necessary and proper" for Congress to criminalize a personal dispute between two foreign nationals to "carry into execution" any of its § 8 powers.  *See* Art. I, § 8, cl. 18.

Finally, no other provision of the Constitution provides Congress with authority to regulate the limited conduct at issue in this case.  The Commerce Clause, which was not cited in MEJA's legislative history but which the government often asserts as a basis for policing private

8

conduct, is also inapplicable here.  Mr. Brehm's alleged assault of J.O. – which lasted no more than a matter of minutes – did not impact commercial activity in a manner that would support MEJA's regulation of this conduct under the Commerce Clause.  In *Lopez*, the Supreme Court held that Congress's Commerce Clause authority was limited to regulation of channels of interstate commerce, instrumentalities of interstate commerce, and "activities having a substantial relation to interstate commerce . . . i.e., those activities that substantially affect interstate commerce." 514 U.S. at 558-559.  Mr. Brehm's alleged assault on J.O. fails to meet any of these requirements.  Extending MEJA to this conduct would "convert congressional authority under the Commerce Clause to a general police power" over foreign nationals based on an attenuated connection to the United States.

Because the Constitution does not grant Congress the authority to police the conduct at issue in this case under the Commerce Clause or any other provision, this Court should dismiss this case as extending beyond Congress's enumerated powers.

B.     **MEJA Should Be Construed Consistently With Precedent Regarding The Extraterritiroal Application Of Domestic Criminal Statutes.**

Construing Congress's power as not including the power to regulate the alleged offense conduct is consistent with traditional standards regarding extraterritorial application of domestic criminal statutes.  *See, e.g.*, *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818) (Marshall, C.J.).  In *Palmer*, three Americans robbed a Spanish ship and were charged with violating the nation's first piracy law, titled an Act for the Punishment of Certain Crimes Against the United States, ch. 9, sec. 8, 1 Stat. 112 (1790) (hereinafter "1790 Piracy Act").  Similar to MEJA, the 1790 Piracy Act broadly prohibited "murder or robbery, or any other offence which if committed

within the body of a county, would by the laws of the United States be punishable with death."

*Id.* In *Palmer*, however, the Supreme Court held that the statute did not apply to foreign vessels. 16 U.S. at 633-34. Notwithstanding the statute's broad language, the *Palmer* Court held that it could not be construed as applying to "a seaman on board a ship sailing under a foreign flag, under the jurisdiction of a foreign government" because "[e]very nation provides for such offences the punishment its own policy may dictate; and no general words of a statute ought to be construed to embrace them when committed by foreigners against a foreign government." *Id.* at 632-33. Like the piracy statute in *Palmer*, MEJA should not be given extraterritorial effect to foreigners who act against other foreigners and have little, if any, connection to this country.

Moreover, the outcome in *Palmer* is consistent with modern standards that courts traditionally rely on in evaluating the extraterritorial application of domestic criminal statutes. *See United States v. MacAllister*, 160 F.3d 1304, 1308 n.9 (11th Cir. 1998) (listing standards); *see also United States v. Banjoko*, 590 F.3d 1278, 1281 (11th Cir. 2009); *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002); *United States v. Benitez*, 741 F.2d 1312, 1316 (11th Cir. 1984). In basic terms, these standards favor construing domestic criminal statutes as *not* reaching foreign conduct, unless (1) American citizens were involved, (2) the offense falls into a small category of universally condemned acts (e.g., piracy, war crimes), or (3) the conduct rises to the level of threatening the nation's security. *See, e.g.*, *Hill*, 279 F.3d at 740 (allowing extraterritorial application of criminal statute because victim was an American citizen); *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1206 (9th Cir. 1991) (defendant's murder of DEA agent threatened national security and therefore supported extraterritorial application of criminal statute).

When Congress enacted MEJA, it did so against the backdrop of these standards and with the knowledge that MEJA could raise "Constitutional concerns" if applied to foreign nationals having only a tenuous connection to the United States. H.R. REPT. NO. 106-778(I) (2000), 2000 WL 1008725, at *21 (statement of DOD Acting General Counsel Dworkin). Accordingly, construing Congress's legislative power as not extending to routine assaults between foreign nationals is consistent with well-established standards and Supreme Court precedent concerning the extraterritorial application of domestic criminal laws.

## CONCLUSION

For the reasons set forth above, Mr. Brehm respectfully submits that the Court should dismiss this matter.

Respectfully submitted,
SEAN THEODORE BREHM

By Counsel,
Michael S. Nachmanoff,
Federal Public Defender

_____/s/_____
Michael S. Nachmanoff
Virginia Bar Number 39180
Attorney for the defendant
Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600- 0860 (telephone)
(703) 600-0880 (fax)
Michael_Nachmanoff@fd.org (e-mail)

Whitney E.C. Minter
Virginia Bar Number 47193
Attorney for the defendant
Assistant Federal Public Defender
1650 King Street, Suite 500

11

Alexandria, Virginia 22314
(703) 600- 0855 (telephone)
(703) 600-0880 (fax)
Whitney_Minter@fd.org (e-mail)

Jeffrey C. Corey
Admitted *Pro Hac Vice*
Attorney for the defendant
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0859 (telephone)
(703) 600-0880 (fax)
Jeff_Corey@fd.org (e-mail)

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of March 2011, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Ronald L. Walutes, Esq.
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, Virginia, 22314
(703) 299-3700
Ron.Walutes@usdoj.gov

James Yoon, Esq.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria , Virginia 22314
(703) 299-3700
James.Yoon@usdoj.gov

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

_____/s/_____
Jeffrey C. Corey, Esq.
Attorney for the defendant
Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0859 (telephone)
(703) 600-0880 (fax)
Jeff_Corey@fd.org (e-mail)