IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. 1:11-cr-11 |
| ) | |
| SEAN THEODORE BREHM, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## **MEMORANDUM OPINION**

Following an alleged knife attack at Kandahar Airfield, Afghanistan ("KAF") on November 25, 2010, Defendant Sean Theodore Brehm ("Brehm") was charged in a two count indictment with assault with a dangerous weapon in violation of 18 U.S.C. § 113(a)(3) and assault resulting in serious bodily injury in violation of 18 U.S.C. § 113(a)(6). Brehm is a citizen of South Africa, who at the time of the alleged attack, was employed by DynCorp International LLC ("DynCorp"), a civilian contractor for the U.S. Department of Defense ("DOD") supporting the U.S. military effort in Afghanistan.

This Court's jurisdiction over Brehm is premised on the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. § 3261 *et seq.*, which provides, in relevant part, that this Court's criminal jurisdiction extends to any person who "engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the ... territorial jurisdiction of the United States while employed by or accompanying the Armed Forces outside the United States." 18 U.S.C. § 3261(a). The term "employed by the Armed Forces outside the United States" is defined to include an employee of a DOD contractor. 18 U.S.C. § 3267(1)(A)(iii).

Brehm does not contest that this prosecution falls within the scope of MEJA, by its terms. He challenges, however, the constitutionality of MEJA, as applied to him in this prosecution, and in support of that challenge, filed a Motion to Dismiss for Lack of Jurisdiction (Doc. No. 23) and a Motion to Dismiss the Indictment as Beyond Congress's Enumerated Powers (Doc. No. 26). Specifically, Brehm contends that as applied to him, MEJA (1) violates the Due Process Clause of the Fifth Amendment because there are insufficient contacts between him and the Unites States to justify the United States' exercise of jurisdiction; and (2) exceeds Congress's enumerated legislative powers under Article I, Section 8 of the United States Constitution. The parties filed a Joint Statement of Undisputed Facts (Doc. No. 32) solely for purposes of these pretrial motions and fully briefed both motions; the Court heard oral argument on Friday, March 18, 2011.

The Court concludes that this prosecution is neither arbitrary nor fundamentally unfair when considered in light of Brehm's nexus to the United States and the effects of his alleged conduct on United States' interests. The Court also concludes that MEJA is within the legislative authority of Congress. For these reasons, as discussed in more detail below, MEJA, as applied to Brehm, is not unconstitutional, and the Court DENIES both motions.

## I. Background[1]

Since October 2001, following the attacks on the United States on September 11, 2001, the United States has been conducting Operation Enduring Freedom in Afghanistan. The United States is currently part of the International Security Assistance

---

[1] Unless indicated otherwise, the facts stated in this Memorandum Opinion are based on the parties' Joint Statement of Undisputed Facts (Doc. No. 32).

Force ("ISAF") in Afghanistan, which is controlled and commanded by the North Atlantic Treaty Organization ("NATO") and consists of five regional commands. KAF, just outside Kandahar in the southern part of the country, is the main staging area for operations in the Regional Command South.

Since October 2001, the United States has mobilized to Afghanistan hundreds of thousands of troops and contracted with numerous private companies to employ thousands of civilian contractors to support its mission in Afghanistan. On or about November 25, 2010, the day of the alleged offenses, the United States military, with more than thirty United States military units, accounted for over 15,000 troops at KAF or about 80% of the approximately 19,000 total NATO military personnel stationed there. In addition, about 6,000 DOD contractors are located there to support the military mission.

Brehm is a citizen of South Africa and has no other citizenship. Before being brought here for the purposes of this prosecution, Brehm never traveled to the United States for any reason. He has no relatives in the United States and his wife and children live in South Africa. At all material times herein, he was present and residing outside the United States in connection with his employment and was not a national of or ordinarily resident in Afghanistan.[2] Before his employment with DynCorp, discussed below, Brehm was working in Kandahar for DHL, a German owned shipping company.

DynCorp is a contractor for the DOD, which was operating in Afghanistan specifically to support the U.S. Army Sustainment Command and provide sustainment logistics and support. On July 25, 2010, Brehm signed an employment contract to serve

---

[2] MEJA expressly excludes from its coverage a civilian employee of DOD contractors who is "not a national of or ordinarily resident in the host nation." 18 U.S.C. § 3267(1)(C).

3

as a Travel Supervisor for DynCorp. Brehm's employment contract provided that Brehm "must comply with applicable laws and regulations of the United States." Brehm also acknowledged in his employment contract that he "has been informed of, understands and accepts that Employee [Brehm] may be subject to U.S. ... federal civilian criminal jurisdiction under the Military Extraterritorial Jurisdiction Act by accompanying the U.S. Armed Forces outside the United States." Exhibit A to Joint Statement of Undisputed Facts, Doc. No. 32-1, ¶ 13.

Also on July 25, 2010, the DOD issued to Brehm an official Letter of Authorization from the United States Army Sustainment Command authorizing him to be in Afghanistan and permitting him to work at KAF in support of DOD's mission. In addition to permitting him to work at KAF, the Letter of Authorization entitled Brehm to receive various government furnished services, including transportation, government furnished meals, military issued equipment, access to the military exchange and military banking and "resuscitative care." Letter of Authorization, Exhibit B to Joint Statement of Undisputed Facts (Doc. No. 32-2).

Brehm's job duties as a DynCorp Travel Supervisor required him to live in Kandahar, Afghanistan and work at the company's administrative office in Kandahar.[3] Specifically, he was responsible for making travel arrangements for DynCorp employees who were flying into or departing from Afghanistan. His duties involved processing incoming and outgoing DynCorp employees and providing DynCorp employees with

---

[3] During the hearings on these motions, the United States represented that Brehm and other U.S. contractors were required to reside at KAF and were not allowed to leave KAF without permission. While there does not appear to be a dispute over these facts, they are not part of the parties' Joint Statement of Undisputed Facts and the Court does not rely on them for its decision.

4

credentials when they arrived in Afghanistan. In August 2010, shortly after accepting the position with DynCorp, Brehm applied for a visa to allow him to travel to the United States, believing that his job would require occasional travel to the United States to assist DynCorp with its travel operations in Afghanistan. The United States denied his request.

On November 25, 2010, at around 2:15 p.m., Brehm was working at KAF airport and assigned to process about thirty incoming DynCorp contractors who were arriving that afternoon to support the United States military mission in Afghanistan. Around this time, J.O., a citizen of the United Kingdom, and his wife, a United States citizen also employed by a DOD contractor, were returning from an extended vacation during which time the couple spent some time in the United States. At that time, J.O. was employed in Kandahar by Global Strategies, a private corporation that contracts with the U.S. Agency for International Development ("USAID").

J.O. and Brehm saw each other at the KAF airport and the two men got into a verbal argument regarding a pre-existing personal dispute, unrelated to their work. Thereafter, Brehm is alleged to have stabbed J.O. at the KAF airport. J.O. had just deplaned when the altercation began, was carrying a bag on his back, and pulling his luggage out of KAF airport.

The alleged incident was interrupted by an armed U.S. Criminal Investigation Division ("CID") agent with the Army's 12th MP Detachment, coincidentally present at the airport to pick up a witness on another case and who witnessed the stabbing. At that time, the Army CID agent drew his firearm and ordered Brehm to drop his weapon. The Army CID agent had to repeat that command several times before Brehm complied and went to the ground. Simultaneously, two U.S. military contractors tried to physically

5

intervene between the two men, but backed away from Brehm once the Army CID agent shouted his command to Brehm. The incident, from the time J.O. and Brehm began their verbal argument to the moment the CID agent intervened to stop their fight, lasted approximately 9 or 10 minutes.

Following the attack, a U.S. army medic, incidentally on the scene, together with U.S. military contractors (including DynCorp personnel) rendered immediate aid. Other DOD contractors called for help and the military police. J.O. was rushed to the U.S. Navy-run military hospital in KAF, where U.S. military doctors performed emergency surgery on J.O., who was eventually medevaced to Bagram Airfield – a U.S. military base 300 miles away – for additional surgery. Several U.S. military police officers arrived to secure the scene. The area of the incident at KAF airport was temporarily closed off and processed as part of the military's criminal investigation.

Brehm was taken into custody following the incident and the U.S. military police arrested, removed and then detained Brehm in the ISAF Military Police Detention Cell ("Cell"), pursuant to military authority. DynCorp also terminated his employment.

The military police do not ordinarily operate the Cell, which is manned only when there is a prisoner; and Brehm was the only prisoner during the time that he was in the Cell. The military deployed two U.S. military police personnel to guard him 24 hours a day.

On December 10, 2010, a United States Magistrate Judge issued an arrest warrant for Brehm and a preliminary hearing was held in which Brehm appeared telephonically. On the same day, a Magistrate Judge ordered Brehm transported to this District. On December 21, 2010, Brehm was brought to this District pursuant to MEJA's venue

6

provisions, 18 U.S.C. § 3238. On January 5, 2011, the grand jury returned the two count indictment filed herein. Brehm was arraigned in this Court on January 14, 2011, at which time he entered a plea of not guilty and a jury trial was scheduled to begin on May 10, 2011.

## II. Analysis

Brehm moves to dismiss the indictment on the grounds that MEJA, with its extraterritorial reach, is unconstitutional as applied to him in this case. As a general proposition, Congress has the authority to enforce its laws beyond the territorial boundaries of the United States. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). Generally, however, statutes are presumed to apply to offenses committed only within the territorial jurisdiction of the United States, and statutes are presumed not to apply extraterritorially absent the "clearly expressed" intention of Congress to extend jurisdiction beyond American borders. *See United States v. Mohammad-Omar*, 323 F. App'x. 259, 261 (4th Cir. 2009) (unpublished) (citing *Arabian American Oil Co.*, 499 U.S. at 248). This presumption is overcome, however, when Congress explicitly drafts a statute "to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *Arabian*, 499 U.S. at 248. Here, there is no doubt that Congress clearly expressed its intention to reach conduct outside of the United States; and Brehm concedes as much. The only issue remaining for the Court is to "ensure Congress' reach does not exceed its constitutional grasp" as applied to the facts of this case. *United States v. Shahani-Jahromi*, 286 F. Supp. 2d 723, 727 (E.D.Va. 2003). For this reason, in order to resolve Brehm's challenges, the Court's inquiry is limited to whether the application of MEJA to Defendant's conduct violates the Due

7

Process Clause of the Fifth Amendment or is otherwise outside the legislative authority of Congress.

A. Due Process Challenge

Although there is no binding precedent as to the constitutionality of MEJA in the circumstances presented by Brehm's prosecution, it appears settled that the critical, dispositive inquiry under the Due Process Clause is whether such jurisdiction can be exercised without being arbitrary or contrary to fundamental notions of fairness. In making that assessment, courts in this and other circuits have focused on whether there is a "sufficient nexus" between the defendant and the United States, such that the application of the statute would not be arbitrary or fundamentally unfair. *See Mohammad-Omar*, 323 F. App'x. at 261 (citing *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) and *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990)); *Shahani-Jahromi*, 286 F. Supp. 2d at 727.[4] The nexus requirement "'serves the same purpose as the minimum contacts test in personal jurisdiction,' namely ensuring that a 'United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country.'" *United States v. Ayesh*, ---F. Supp. 2d-

---

[4] Some courts have dispensed with requiring a specific "nexus," but rather have simply considered whether the prosecution of the defendant would be arbitrary or fundamentally unfair. *See United States v. Suerte*, 291 F.3d 366 (5th Cir. 2002) (collecting and discussing cases). As a judge from this District has observed, the difference between these tests is "less real than apparent; the existence of a nexus is what makes the prosecution neither arbitrary nor fundamentally unfair." *Shahani-Jahromi*, 286 F. Supp. 2d at 729 n. 9 (J. Ellis). Although the Court has adopted for the purposes of its analysis the "sufficient nexus" test, the Court would reach the same result under the alternative formulation adopted by the Fifth Circuit.

--, No. 1:10-cr-388 (TSE), 2011 WL 325903, at *8 (E.D. Va. Jan. 28, 2011) (quoting *Mohammad-Omar*, 323 F. App'x. at 261).[5]

Courts that have applied this nexus test have considered a wide range of factors including (1) the defendant's actual contacts with the United States, including his citizenship or residency; (2) the location of the acts allegedly giving rise to the alleged offense; (3) the intended effect a defendant's conduct has on or within the United States; and (4) the impact on significant United States interests. *See Yousef*, 327 F.3d at 112 (finding a sufficient nexus existed between the defendants and the United States "[g]iven the substantial intended effect of their [planned] attack on the United States and its citizens"); *Davis*, 905 F.2d at 247 (finding the nexus requirement satisfied where the captain's intent to smuggle contraband into United States territory demonstrated that the "attempted transaction is aimed at causing criminal acts within the United States"); *Mohammad-Omar*, 323 F. App'x. at 262 (finding sufficient nexus between foreign citizen and the United States on account of drug activity in Afghanistan, Dubai, and Ghana because the defendant knew the drugs were destined for the United States); *Shahani-Jahromi*, 286 F. Supp. 2d at 725 (finding a sufficient nexus when defendant retained his child in Iran in violation of the mother's lawful American custody order because the defendant and child were U.S. citizens, the marriage between the defendant and mother

---

[5] Brehm urges the Court to adopt "the minimum contacts" test used in civil cases to assess the constitutional permissibility of exercising personal jurisdiction, including, as a requirement, whether the claims against a defendant "arise out of or relate to" his contacts with the United States. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985). While the "minimum contacts" test used in civil cases and the "sufficient nexus" test used in the criminal context serve the same purpose, there are fundamental differences pertaining to considerations of national sovereignty and the public interest; and the Court has found no case that has conflated the due process analysis in the criminal context with the personal jurisdiction analysis in the civil context.

took place in the U.S., and the U.S. has a clear interest in ensuring that parental rights are protected); *United States v. Clark*, 315 F. Supp. 2d 1127, 1133 (W.D. Wash. 2004) (finding the nexus requirement satisfied in a case involving illicit sexual conduct with a child in a foreign country because the defendant, an American citizen, "could reasonably anticipate being haled into court in the United States for illicit sexual conduct with a child in a foreign country."). More pertinent to this case, courts have also found a sufficient nexus where a defendant's alleged conduct was facilitated through his employment with an agency of the United States. For example, in *United States v. Ayesh*, the court concluded that prosecuting in the United States a defendant who was a primary resident of Jordan, employed by the United States Embassy in Baghdad, Iraq, was neither arbitrary nor fundamentally unfair because defendant's employment was central to the commission of his alleged crimes. *Ayesh*, ---F. Supp. 2d---, 2011 WL 325903, at *8. Based on the facts and circumstances surrounding Brehm's alleged conduct, the Court concludes that there is a sufficient nexus between Brehm and the United States such that his prosecution is neither arbitrary nor fundamentally unfair and thus, does not violate the Due Process Clause of the Fifth Amendment.

In determining that there is a sufficient nexus between Brehm and the United States to support this Court's jurisdiction, the Court has focused on the nature and extent of Brehm's relationship with the United States and the effect of his alleged conduct on American interests. First, Brehm's employment with DynCorp established a relationship with the United States that provided him with certain privileges, benefits and services from the United States, including access to KAF itself. *See* Letter of Authorization, Exhibit B to Joint Statement of Undisputed Facts (Doc. No. 32-2). Second, Brehm's

privileged access to KAF, obtained from the DOD only because of his employment, directly facilitated his alleged conduct against the victim, J.O., another civilian contractor who had been given privileged access to the protected and restricted environment of KAF. Third, Brehm's alleged conduct directly impacted the United States' interests and resources. It negatively affected the ability of Brehm and the victim, as well as that of their employers, to efficiently support the United States military effort. It disrupted the peace and safety of KAF. It diverted American resources and manpower needed to respond to both Brehm's alleged conduct and the consequences inflicted on the victim and others, including the victim's American wife present shortly after the time of the alleged attack. It can hardly be doubted that the United States has an interest in maintaining the peace at KAF, protecting the many thousands of individuals, both military and civilian, present at KAF at the invitation and direction of the United States to support its military mission in Afghanistan, and sustaining the morale and good order of its troops and contractors as well as its good relations with the host country.[6] MEJA clearly promotes all of these interests of the United States; and Brehm's alleged conduct just as clearly negatively impacted and compromised them. As Congress appreciated, in the absence of this Court's exercise of jurisdiction, KAF would present the specter of a lawless enclave, with all the adverse consequences that would flow from such a situation.

---

[6] Brehm appears to concede as much when he states that MEJA would pass constitutional scrutiny had Brehm's alleged attack been upon a member of the United States armed forces. *See* Defendant's Motion to Dismiss the Indictment as Beyond Congress's Enumerated Powers at 4 (Doc. No. 26) ("Indeed, if a foreign employee of a DOD contractor assaulted a member of the United States armed forces or defrauded the United States government, there is little doubt that Congress could punish him pursuant to MEJA.").

Nor should Brehm be surprised by this Court's assertion of jurisdiction over him. Brehm's employment contract put him on notice that as a result of his employment, he may in fact be subject to the criminal jurisdiction of the United States. In this regard, Clause 13(c) of his employment contract stated the following:

> Employee hereby acknowledges that Employee has been informed of, understands and accepts that Employee may be subject to U.S. ... federal civilian criminal jurisdiction under the Military Extraterritorial Jurisdiction Act by accompanying the U.S. Armed Forces outside the United States.

Exhibit A to Joint Statement of Undisputed Facts (Doc. No. 32-1).[7] While this notice and acknowledgement do not constitute a waiver of Brehm's constitutional challenge, or even an agreement on his part that he could be prosecuted in the United States under MEJA, the clause is an acknowledgement and recognition on his part that he was entering into a relationship that affected United States interests over which the United States claimed jurisdiction and that the United States might assert jurisdiction over him in precisely the way that it has.[8]

Based on the circumstances and relationship between the United States and Brehm, it cannot be reasonably argued that Brehm's conduct was so unrelated to American interests as to render his prosecution in the United States arbitrary or

---

[7] The United States also relies on the choice of law and forum selection provision, Clause 20, of Brehm's employment contract with DynCorp, under which Brehm agrees to be subject to the laws of the Commonwealth of Virginia, United States of America. While this provision relates to whether Brehm had minimum contacts with the United States or the Commonwealth of Virginia for the purposes of personal jurisdiction in a civil case dealing with disputes arising out of Brehm's contract with DynCorp, the Court does not find that this civil dispute resolution provision is relevant to the due process inquiry with respect to MEJA.

[8] Brehm's recognition that by accepting a position with DynCorp he formed a relationship with the United States is further evidenced by his application for a U.S. visa shortly after accepting the position at DynCorp because he believed his work for DynCorp would require travel to the United States.

fundamentally unfair. Rather, Brehm voluntarily and knowingly entered into a relationship so related to the United States and its military mission in Afghanistan that Brehm should have reasonably anticipated being haled into court in the United States as a result of his alleged conduct, particularly in light of the notices, privileges and benefits he received because of this employment.[9]

### B. The Enumerated Powers Challenge

Brehm also argues that, as applied to the facts of this case, MEJA exceeds Congress's enumerated powers. Specifically, Defendant asserts that under Article 1, section 8, cls. 10, 14, 16, and 18 of the United States Constitution -- Congress's articulated source of power in enacting MEJA -- Congress does not have the authority to pass legislation that reaches Brehm's alleged conduct.

Defendant's argument begins from a false premise. While the Constitution limits congressional authority to legislate as between the national government and the states, and otherwise defines the authority of Congress relative to the other two branches of the federal government, the authority of Congress to legislate with respect to affairs external to the boundaries of the United States is based on national sovereignty in foreign affairs and, therefore, is not limited by the enumerated powers delegated to Congress in Article 1, Section 8.

---

[9] Given Congress's explicit expression to exercise extraterritorial jurisdiction through MEJA, the Court need not consider whether this Court's exercise of jurisdiction would be consistent with customary international law to which the United States is not subordinate. Nevertheless, the Court notes that this Court's exercise of such jurisdiction is in fact consistent with the exercise of criminal jurisdiction under customary international law, particularly under the "protective principle." *See United States v. Alomia-Riascos*, 825 F.2d 769, 771 (4th Cir. 1987) ("The protective principle of international law permits a nation to assert subject matter criminal jurisdiction over a person whose conduct outside the nation's territory threatens the national interest."); *see also Yousef*, 327 F.3d at 91-92.

The United States Constitution, Article 1, Section 1, provides: "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. 1, § 1. This grant of legislative authority is a limited grant of power *vis-à-vis* the powers retained by the states. However, the "broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers is categorically true only in respect of our internal affairs." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315-16 (1936). As the United States Supreme Court has explained, "since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source." *Id.* at 316. Rather, "the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution ... [but] would have vested in the federal government as necessary concomitants of nationality." *Id.* at 318. Thus, there is no constitutional bar – premised on Congress's enumerated powers – to the extraterritorial application of penal statutes like MEJA; other courts have in fact so held with respect to MEJA. *See United States v. Williams*, 722 F. Supp. 2d 1313, 1317-18 (E.D. Va. 2010) (finding Congress did not lack constitutional authority to enact MEJA because the limitations of the enumerated powers do not apply externally); [10] *United*

---

[10] Brehm contends that *Williams* is "wholly inapplicable" because in that case the defendant brought a facial challenge to Congress's enumerated powers to enact MEJA, as opposed to his as-applied challenge. *See* Defendant's Motion to Dismiss the Indictment As Beyond Congress's Enumerated Powers, at 4 n. 1 (Doc. No. 26). As explained above, however, Article I, Section 8's enumerated powers do not limit Congress's power to legislate in the area of external affairs. MEJA, therefore, cannot be attacked on the grounds of Congress's enumerated powers either in a facial or as-applied challenge.

*States v. Broussard*, No. 08-0367 (RTH), 2010 WL 582778 (W.D. La. Feb. 17, 2010) (rejecting the argument that MEJA goes beyond the enumerated powers of Congress as applied to the Defendant because "[i]t is clear that Congress has the authority to confer jurisdiction under MEJA to prosecute civilians accompanying the military oversees."); *see also United States v. Plummer*, 221 F.3d 1298, 1304 (11th Cir. 2000) ("Congress unquestionably has the authority to enforce its laws beyond the territorial boundaries of the United States."); *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir. 1984) ("There is no constitutional bar to the extraterritorial application of penal laws"). For these reasons, Congress had the authority to enact MEJA, whose constitutional application to Brehm is to be judged only through the Due Process Clause of the Fifth Amendment, discussed above.[11]

---

[11] Although the Court does not reach whether MEJA falls within the authority of Congress as set forth in Article 1, Section 8, the Court observes that Congress has "broad constitutional power" to raise and regulate armies and navies. *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981). It has long been recognized that "[t]he constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping." *United States v. O'Brien*, 391 U.S 367, 377 (1968); *see also Toth v. Quarles*, 350 U.S. 11 (1955) (finding that Congress did not have the legislative power to subject a civilian no longer associated with the military to a trial in a military court for an offense that took place outside the United States, while he was in the military, but expressly assuming that Congress had the power to subject such an individual to prosecution for the offense in an Article III court). Here, Congress clearly made the judgment that regulation of the military mission abroad requires regulation of those whose conduct impacts that mission; and it provided in MEJA for trial in an Article III court. *See* H.R. Rep. No. 106-778, at 5 (recommending proposed statute to fill the "jurisdictional gap" in Federal law by extending the application of criminal jurisdiction to, *inter alia*, foreign nationals who commit criminal acts while employed by or otherwise accompanying the United States Armed Forces outside the United States).

## Conclusion

For the above reasons, the Court concludes that this prosecution does not violate the Due Process Clause of the Fifth Amendment and MEJA, as applied to Brehm, is not beyond Congress's enumerated powers. The Court therefore DENIES both motions to dismiss.

An appropriate Order will follow.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
March 30, 2011